ROSIE J. DOE ET AL. *v.* STATE OF CONNECTICUT ET AL.
(13744)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

---

86

Argued April 3—decision released July 31, 1990

*Arnold B. Feigin,* assistant attorney general, with whom were *Carolyn K. Querijero,* assistant attorney general, and, on the brief, *Clarine Nardi Riddle,* attorney general, and *Richard T. Couture,* assistant attorney general, for the appellants (defendants).

*Wesley W. Horton,* with whom was *Susan M. Cormier,* for the appellees (plaintiffs).

CALLAHAN, J. The principal issue in this appeal is whether the class of indigent women represented by the named plaintiff[1] is constitutionally entitled to an

---

[1] At the inception of this litigation, the named plaintiff obtained an order of the trial court that permitted her to prosecute the action under a fictitious name.

award of attorneys' fees and costs as found by the trial court. We conclude that article first, § 10 of the state constitution did not authorize the trial court to make such an award and, therefore, reverse the judgment.

This case began on August 20, 1981, when the named plaintiff and her physician brought a class action[2] challenging the legality of a regulation issued by the defendant commissioner of income maintenance.[3] The regulation restricted the funding of abortions under the Connecticut Medical Assistance Program (Medicaid); General Statutes §§ 17-134a through 17-134*l*; to only those abortions "necessary because the life of the mother would be endangered if the fetus were carried to term."[4] After a trial on the merits, the trial court, *Berdon, J.*, on April 9, 1986, held that the regulation

[2] After a hearing, on October 9, 1981, the trial court certified two classes of plaintiffs: "(1) indigent pregnant women eligible for Medicaid who seek a medically necessary abortion, represented by the named plaintiff; and (2) physicians certified by the state to provide medical care under Medicaid who agree to perform medically necessary abortions or advise women concerning them, represented by the named plaintiff's physician." *Doe* v. *Heintz,* 204 Conn. 17, 20, 526 A.2d 1318 (1987).

[3] The treasurer of the state of Connecticut was also a party defendant. Because the plaintiffs sought to sue both state officers in their official capacities, the suit, in effect, was against the state of Connecticut. *Doe* v. *Maher,* 40 Conn. Sup. 394, 395 n.2, 515 A.2d 134 (1986); see *Sentner* v. *Board of Trustees,* 184 Conn. 339, 342, 439 A.2d 1033 (1981). "Therefore, we have dealt with such suits as if they were solely against the state and have referred to the state as the defendant." *Sentner* v. *Board of Trustees,* supra.

[4] The regulation issued by the department of income maintenance closely paralleled the June 5, 1981 version of the Hyde Amendment as enacted by Congress. In *Harris* v. *McRae,* the United States Supreme Court had upheld the validity of an earlier version of the Hyde Amendment that denied public funding for certain medically necessary abortions. *Harris* v. *McRae,* 448 U.S. 297, 100 S. Ct. 2671, 65 L. Ed. 2d 784, reh. denied, 448 U.S. 917, 101 S. Ct. 39, 65 L. Ed. 2d 1180 (1980). The court rejected claims that the Hyde Amendment: (1) violated the due process right of a woman to terminate her pregnancy; (2) interfered with her freedom of religion; and (3) denied indigent women equal protection of the laws. Id., 326–27. The court also concluded that a state participating in the Medicaid program is not obligated by that program to pay for medically necessary abortions for which Congress has withheld federal funding. Id., 326.

exceeded the statutory authority of the commissioner of income maintenance and violated the plaintiffs' right to due process under § 10 of article first of the state constitution and to equal protection of the laws under §§ 1 and 20 of that article. *Doe* v. *Maher,* 40 Conn. Sup. 394, 395, 515 A.2d 134 (1986). Accordingly, the trial court enjoined the commissioner from enforcing the regulation and ordered the defendants to pay for all medically necessary abortions[5] to the same extent that the defendants pay for all other medical costs under the Medicaid program. The defendants did not appeal the trial court's judgment of April 9, 1986.

After a further evidentiary proceeding pursuant to a bifurcation order,[6] the trial court, on June 26, 1986, awarded $164,942.83 in attorneys' fees and costs to the named plaintiff's class of indigent women.[7] The defendants appealed that decision to this court. In *Doe* v. *Heintz,* 204 Conn. 17, 33–34, 526 A.2d 1318 (1987), we concluded that the plaintiffs had failed to exhaust the administrative remedy available to them of first presenting their claim to the claims commissioner in accordance with General Statutes §§ 4-141 through 4-165b. We determined that because a "private party in the same position as the state in this case would not have been liable for attorneys' fees"; id., 36; any authorization to sue the state would be fruitless because the state's liability in such a suit is "coextensive" with that of a private person. General Statutes § 4-160 (a). Nevertheless, we noted that if the claim had been filed with the commissioner, "the commissioner would have

---

[5] The trial court defined medically necessary or therapeutic abortions as "abortions necessary to ameliorate a condition that is deleterious to a woman's physical and or psychological health." *Doe* v. *Maher,* 40 Conn. Sup. 394, 396 n.4, 515 A.2d 134 (1986).

[6] The plaintiffs made a claim for attorneys' fees and costs in their original complaint.

[7] The trial court denied the request for attorneys' fees and costs made by the class of physicians.

been empowered to consider whether the plaintiffs' demand for attorneys' fees constituted a 'just claim,' one that 'in equity and justice the state should pay . . . .' General Statutes § 4-141." Id., 36–37. Because the plaintiffs had failed to pursue this administrative remedy, we held that the trial court lacked jurisdiction to consider the merits of the issues presented. Accordingly, we concluded that the trial court should have dismissed the plaintiffs' claim for attorneys' fees and costs. We, therefore, set aside the supplemental judgment awarding the plaintiffs counsel fees and costs and remanded the case to the trial court with direction to render judgment dismissing the claim.

The date that our decision in *Doe* v. *Heintz* was released, June 9, 1987, the plaintiffs filed a notice of claim with the claims commissioner requesting the state to pay their attorneys' fees and costs "incurred to implement their right to judicial redress of injuries for violations by the state of the plaintiffs' statutory and constitutional rights." In the alternative, they sought permission from the claims commissioner to sue the state.[8] The defendants filed a motion to dismiss, asserting that the plaintiffs had not timely filed their claim in accordance with General Statutes § 4-148. On December 21, 1987, the claims commissioner rejected the defendants' argument, and granted the plaintiffs permission to sue the state.[9]

The plaintiffs, thereafter, brought this action on March 17, 1988, seeking attorneys' fees and costs in the amount of $164,942.83, "incurred [while] remedy-

[8] The plaintiffs filed an amended notice of claim on October 21, 1987. The amended notice of claim apparently sought to clarify that the claim for attorneys' fees was not limited to the fees claimed and allowed by the trial court in June, 1986, but also encompassed services rendered through August, 1986.

[9] The finding and order make no reference to the plaintiffs' claim for payment of attorneys' fees and costs.

ing the state's violations of their constitutional rights." After a trial on the merits, on June 28, 1989, the trial court, *Hodgson, J.,* awarded the plaintiffs attorneys' fees in the amount of $134,505.29.[10] The defendants appealed the trial court's judgment to the Appellate Court. We transferred this appeal to ourselves pursuant to Practice Book § 4023.

In appealing from the judgment rendered June 28, 1989, the defendants maintain that the trial court erred by concluding that: (1) the plaintiffs' claim was timely filed with the claims commissioner; (2) the claims commissioner had the authority to grant the plaintiffs permission to sue the state; and (3) article first, § 10 of the Connecticut constitution requires the state to pay the plaintiffs' attorneys' fees and costs.

I

On appeal, the defendants argue, as a threshold issue, that the trial court erred when it held that the plaintiffs' claim was not time-barred by General Statutes § 4-148. The following facts are relevant to this argument. On April 9, 1986, the trial court, *Berdon, J.,* rendered a declaratory judgment that the regulation at issue was invalid because it contravened General Statutes §§ 17-134a through 17-134*l* and because it violated the rights of the plaintiffs under certain provisions of the Connecticut constitution. The court enjoined the commissioner from enforcing the regulation and ordered the defendants to pay the costs of all medically necessary abortions on the same basis as other claims under the Medicaid program. After the decision, the court conducted further hearings on the plaintiffs' bifurcated claim for attorneys' fees and costs. In addition, the plaintiffs' attorneys prepared a court ordered judgment file and monitored the defendants' compli-

---

[10] The trial court rejected the plaintiffs' claim that a multiplier be added to enhance the actual fees.

ance with the court's order to provide notice to each member of the class that medically necessary abortions would be paid for by Medicaid. The plaintiffs required the services of their attorneys through August 5, 1986.[11]

The defendants contend that the plaintiffs failed to file their claim with the claims commissioner on a timely basis in accordance with General Statutes § 4-148 (a), which states in pertinent part: "No claim shall be presented under this chapter but within one year after it accrues." Because the legislature has chosen not to define the term "accrues," the defendants urge us to construe it to mean the date on which judgment was entered. They argue that because the plaintiffs failed to file their claim with the claims commissioner until June 9, 1987, more than one year after April 9, 1986, the date that judgment was entered, the claim was not timely filed. Consequently, they contend, the claims commissioner lacked jurisdiction to consider it. We need not decide that issue at this time, however, because we agree with the trial court's conclusion that the plaintiffs timely filed their claim in accordance with § 4-148.

When the claim for attorneys' fees is based upon continuous legal representation, the statute of limitations does not begin to run until the legal services are complete. See *Connell* v. *Colwell,* 214 Conn. 242, 253, 571

---

[11] The trial court stated: "In this case, in response to a motion for clarification and order of notice filed by the plaintiffs, Judge Berdon, on May 15, 1986, directed as further relief to the plaintiffs that the defendants furnish a written notice to all members of the plaintiff class 'on or before July 1, 1986' including a Spanish translation which he ordered the plaintiffs to prepare. Plaintiffs' counsels' work in securing the defendants' initial compliance with this portion of the remedy was part and parcel of its representation of the plaintiffs in the litigation and was part of the initial securing of a remedy." The order dated May 15, 1986, was subsequently amended by the trial court, *Berdon, J.,* directing the defendants to send notice on or before August 1, 1986.

A.2d 116 (1990); *Gaylord Hospital* v. *Massaro,* 5 Conn. App. 465, 467, 499 A.2d 1162 (1985); *Cannell* v. *Bulicek,* 8 Ohio App. 3d 331, 335, 457 N.E.2d 891 (1983); *Hart* v. *Day,* 17 Wash. App. 407, 413, 563 P.2d 227 (1977), review denied, 89 Wash. 2d 1018 (1978). The statute of limitations is tolled during the pendency of the continuous representation.

In this case, the plaintiffs are seeking attorneys' fees and costs "which were incurred to implement their right to judicial redress of injuries for violations by the state of the plaintiffs' statutory and constitutional rights." As part of that continuing legal representation, the plaintiffs' attorneys were obligated to perform services for the plaintiffs after the date judgment was entered, April 9, 1986. The plaintiffs' attorneys were ordered, by the court, to prepare a judgment file and to assist in the implementation of notice of the availability of Medicaid funds to the members of the class of indigent women in need of medically necessary abortions. Since the plaintiffs were seeking an award for attorneys' fees and costs incurred in obtaining necessary health related benefits, their claim would not fully accrue until those services were completed. See *Handler* v. *Remington Arms Co.,* 144 Conn. 316, 321, 130 A.2d 793 (1957) ("[w]hen the wrong sued upon consists of a continuing course of conduct, the statute does not begin to run until that course of conduct is completed"). In order to effectuate the trial court's judgment, the plaintiffs' counsel were obligated to carry out the court's orders. Thus, the plaintiffs' claim was not ascertainable in toto until August 5, 1986. We conclude, therefore, that the trial court correctly determined that the plaintiffs had timely filed their notice of claim with the claims commissioner.

## II

The defendants next contend that the doctrine of sovereign immunity bars the plaintiffs' claim for attor-

neys' fees. First, they argue that the claims commissioner cannot authorize lawsuits against the state in derogation of General Statutes § 4-160 (a), which provides in pertinent part: "The rights and liability of the state in each such action shall be coextensive with and shall equal the rights and liability of private persons in like circumstances." Relying upon our determination in *Doe* v. *Heintz,* supra, 36, that "a private party in the same position as the state in this case would not have been liable for attorneys' fees," the defendants argue that the claims commissioner lacked the authority to grant the plaintiffs permission to sue the state and therefore the waiver of sovereign immunity was a "nullity." In the alternative, the defendants assert that, even if the claims commissioner could authorize the lawsuit, if a private party in like circumstances could not be held liable for attorneys' fees and costs, the state cannot be held responsible for them.

Both of these arguments, however, ignore the basis of the trial court's conclusion. The trial court held that in order to effectuate article first, § 10 of our state constitution, the court could award the indigent plaintiffs attorneys' fees and costs. The trial court squarely determined that the "requirements of article first, § 10 create a constitutional necessity" that supersedes § 4-160 (a) and hence the state's sovereign immunity.[12] Therefore, we must determine whether article first, § 10 of the state constitution authorizes the court to order the state to pay the plaintiffs' counsel fees. See *Caldor, Inc.* v. *Thornton,* 191 Conn. 336, 345, 464 A.2d 785 (1983), aff'd, 472 U.S. 703, 105 S. Ct. 2914, 86 L. Ed. 2d 557 (1985).

___

[12] The plaintiffs argue that when the claims commissioner granted them permission to sue the state, he implicitly denied their request for payment. We agree. Thus, having exhausted their administrative remedies, the plaintiffs were free to bring their constitutional claim to the Superior Court. *Sullivan* v. *State,* 189 Conn. 550, 559, 457 A.2d 304 (1983).

### III

The defendants' principal claim on appeal is that the trial court erred by ruling that, in order to "effectuate" article first, § 10 of our constitution, the plaintiffs are entitled to an award of attorneys' fees and costs. At the proceedings below, the plaintiffs advanced a number of theories to justify such an award. While the trial court rejected most of these arguments, recognizing the weight of legal precedent barring a monetary award against the state, it did conclude that the "open courts" and the "right to redress" provisions of article first, § 10 of the state constitution authorized an award of attorneys' fees and costs to the plaintiffs.

In arriving at its conclusion, the court formulated the following list of "standards": (1) the plaintiff's "injury" must arise under the state constitution; (2) "the deprivation of constitutional rights by the state must be the result of an intentional policy"; (3) the constitutional claim must be sufficiently complex to require the services of an attorney; (4) the plaintiff must be unable to afford legal counsel because of his or her poverty; (5) "resort to the courts for relief" must be necessary to end the constitutional deprivation; and (6) the private interest affected must be "substantial." Because the plaintiffs satisfied all of these "standards," the trial court concluded that an award of counsel fees was appropriate in this case.

In the absence of any legal precedent authorizing such a monetary award against the state, the trial court relied, in part, upon our decision in *Lavertue* v. *Niman,* 196 Conn. 403, 493 A.2d 213 (1985), to derive its standards. In *Lavertue,* we concluded that an indigent defendant in a state-supported paternity action had a constitutional right to court-appointed counsel at state expense under the due process clause of the fourteenth

amendment to the United States constitution and under article first, § 10, of our constitution. Id., 412. The defendant's claim in *Lavertue* relied upon: (1) the state action requirement of the fourteenth amendment to the United States constitution; and (2) the unique configuration of paternity actions in this state. Id., 405. We determined that the state involvement in paternity actions was significant enough to trigger the constitutional right to court-appointed counsel under the fourteenth amendment.

The United States Supreme Court decision in *Lassiter* v. *Department of Social Services*, 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640, reh. denied, 453 U.S. 927, 102 S. Ct. 889, 69 L. Ed. 2d 1023 (1981), provided the basis for our analysis in *Lavertue.* "The pre-eminent generalization that emerges from [the United States Supreme Court's] precedents on an indigent's right to appointed counsel is that such a right has been recognized to exist only where the litigant may lose his physical liberty if he loses the litigation." *Lassiter* v. *Department of Social Services,* supra, 25. It is the defendant's interest in personal freedom that triggers the right to appointed counsel. Id.; see *In re Gault*, 387 U.S. 1, 87 S. Ct. 1428, 18 L. Ed. 2d 527 (1967) (juvenile has right to appointed counsel in a delinquency proceeding, even though it may be considered a "civil" proceeding, when it may result in committing the juvenile to an institution). "Significantly, as a litigant's interest in personal liberty diminishes, so does his right to appointed counsel." *Lassiter* v. *Department of Social Services,* supra, 26. Thus, in *Lavertue* we balanced a "mix of factors" against each other, and then weighed the result against the presumption that there is no right to court-appointed counsel unless a loss of physical liberty is at stake. *Lavertue* v. *Niman,* supra, 412; *Lassiter* v. *Department of Social Services,* supra, 27.

Although in *Lavertue* we recognized that "the threat of imprisonment is only indirectly implicated in the paternity suit itself"; *Lavertue* v. *Niman,* supra; our ultimate conclusion was that, based upon "the unique configuration of paternity actions in this state," the defendant was entitled to court-appointed counsel. Id. When describing the "unique configuration" of paternity actions, we stated, "[t]he significance of the state's involvement in actions involving the paternity of children receiving public assistance is enhanced by the fact that all paternity proceedings have ' "quasi-criminal" overtones.' *Little* v. *Streater,* [452 U.S. 1, 10, 101 S. Ct. 2202, 68 L. Ed. 2d 627 (1981)]. A paternity action results in a finding of 'guilt' or 'innocence,' and non-payment of support orders attendant to a finding of 'guilt' may lead to contempt and imprisonment. General Statutes §§ 46b-171, 46b-215, 53-304." *Lavertue* v. *Niman,* supra, 407.

We need not decide in this case, however, whether the risk of impairment of a plaintiff's health, safety and personal integrity implicates a loss of physical liberty similar to that represented in *Lavertue.* The plaintiffs in this case, unlike those in *Lavertue,* do not maintain that they were entitled to court-appointed counsel. Rather, they retained their own counsel and now request the state to pay their attorneys' fees and costs. See *In re Smiley,* 36 N.Y.2d 433, 438–39, 330 N.E.2d 53, 369 N.Y.S.2d 87 (1975) (while trial court had discretion to appoint counsel, it had no power to direct the state to pay the costs of providing counsel absent statutory authority). *Lavertue,* therefore, does not support the plaintiffs' claim.

Any analysis of the question presented, i.e., whether article first, § 10 requires the state to pay the costs of plaintiffs' counsel, must begin with the clear language of the constitution itself. Article first, § 10, contained in our Declaration of Rights, provides: "All courts shall

be open, and every person, for an injury done to him in his person, property or reputation, shall have remedy by due course of law, and right and justice administered without sale, denial or delay." This language has remained unchanged since the adoption of the state constitution of 1818.

The historical background of article first, § 10 provides a useful framework to address the question presented. That provision, which originated in the Magna Carta, has been adopted in substantially the same form, in the constitutional provisions of most of the states. See, e.g., Florida, Article I, § 21; Missouri, Article I, § 14; Oklahoma, Article 2, § 6; Pennsylvania, Article I, § 11; Wisconsin, Article I, § 9. We may look to the precedents of sister states when construing similar language in our own constitution. E. Peters, "State Constitutional Law: Federalism in the Common Law Tradition," 84 Mich. L. Rev. 583, 585 (1986).

Early state court opinions have generally construed the "open courts" provision as prohibiting the state from selling justice by imposing unreasonable charges on the litigants in the courts; *Malin* v. *La Moure County,* 27 N.D. 140, 152, 145 N.W. 582 (1914); and as ending the practice by a corrupt judiciary of demanding gratuities for giving or withholding decisions in pending cases.[13] *Christianson* v. *Pioneer Furniture Co.,*

---

[13] The original purpose of this constitutional provision has been described as follows: "That provision is very old. Its history dates back to the days of Magna Carta. It was designed to prevent a species of official exactions made as the price of delaying or expediting justice. From the lowest officer to the king himself, in the olden times, bribes were freely demanded and taken to procure the benefits of the laws. They bore no relation whatever to our system of exactions for expenses of litigation, called costs, or the charge as a tax on suits, imposed under laws which bear equally upon all; but they were arbitrary exactions sanctioned by the manners of the times, that went to the personal benefit of the judicial head or body controlling the execution of the law, or to servants or officers connected therewith. It was such abuse, among others, that the barons of England forced

101 Wis. 343, 347–48, 77 N.W. 174 (1898); 16A Am. Jur. 2d § 613. The provision was "never intended to guarantee the right to litigate entirely without expense to the litigants, nor to impose upon the public the entire burden of the expense of the maintenance of the courts." *In re Lee,* 64 Okla. 310, 312, 168 P. 53 (1917); *Lommen* v. *Minneapolis Gaslight Co.,* 65 Minn. 196, 208, 68 N.W. 53 (1896). Thus, the imposition of reasonable court fees has been found to pass constitutional challenges under the open courts provision. *Lommen* v. *Minneapolis Gaslight Co.,* supra, 208–209; *In re Lee,* supra, 313.

The trial court analogized this case to *Boddie* v. *Connecticut,* 401 U.S. 371, 380–81, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971), in which the the United States Supreme Court held that the due process clause of the federal constitution forbade the imposition of filing fees that denied indigents, who were unable to pay the fees, access to the courts, the sole means in Connecticut for obtaining a divorce. Implicitly relying on *Boddie,* the trial court reasoned that, in order to ensure that the plaintiffs had access to the courts, it could impose a positive financial burden upon the state for attorneys' fees. Such a broad interpretation of *Boddie,* however, is unfounded.

In *Robertson* v. *Apuzzo,* 170 Conn. 367, 371, 365 A.2d 824, cert. denied, 429 U.S. 852, 97 S. Ct. 142, 50 L. Ed. 2d 126 (1976), the defendant had a right to a jury trial pursuant to General Statutes § 52-438, but, because of his indigency, he was unable to pay "the jury fee required by statute to be paid by any party to a civil action who desires a jury rather than a court trial." Id., 377. After acknowledging the limitations the due

King John to abolish by granting the Magna Carta. . . . *They do not grant the right, but guarantee the preservation of one that existed under the constitution of England."* (Emphasis added.) *Christianson* v. *Pioneer Furniture Co.,* 101 Wis. 343, 347–48, 77 N.W. 174 (1898).

process clause[14] places upon a state's ability to require fees under *Boddie,* this court stated, "[s]ubsequent decisions by the [United States] Supreme Court concerning the constitutionality of filing fees in civil cases reinforce the conclusion that the principle enunciated in *Boddie* is not to be extended further." *Robertson* v. *Apuzzo,* supra, 378; see *Ortwein* v. *Schwab,* 410 U.S. 656, 93 S. Ct. 1172, 35 L. Ed. 2d 572, reh. denied, 411 U.S. 922, 93 S. Ct. 1551, 36 L. Ed. 2d 315 (1973) (requirement of a filing fee, when applied to indigents seeking to appeal an adverse welfare decision, does not violate due process); *United States* v. *Kras,* 409 U.S. 434, 93 S. Ct. 631, 34 L. Ed. 2d 626 (1973) (statute requiring the payment of a filing fee as a condition to a discharge in bankruptcy did not violate access to court under due process clause). Accordingly, we concluded that an indigent defendant in a paternity action was not entitled to a waiver of the statutory fee for a jury trial. *Robertson* v. *Apuzzo,* supra, 383. The United States Supreme Court "obviously stopped short of an unlimited rule that an indigent at all times and in all cases has the right to relief without the payment of fees." *United States* v. *Kras,* supra, 450. Thus, we have never recognized a rule that indigency alone requires the state to waive the fees and costs, and bear the entire financial burden of litigation itself.

On the basis of the record before us and the plain meaning of the open courts provision, it is clear that, in this instance, our courts were "open," and that the plaintiffs had "access" to them. Unlike the defendant in *Boddie,* the plaintiffs successfully brought their action to court. The Connecticut Civil Liberties Foundation, Inc., acted as the legal counsel for the plain-

---

[14] *Robertson* v. *Apuzzo,* 170 Conn. 367, 371, 365 A.2d 824, cert. denied, 429 U.S. 852, 97 S. Ct. 142, 50 L. Ed. 2d 126 (1976), involved a claim pursuant to the due process clause of the federal constitution rather than article first, § 10 of the Connecticut constitution.

tiffs throughout all phases of the protracted litigation. After a trial on the merits, the trial court, *Berdon, J.*, declared the challenged regulation invalid and enjoined the commissioner from enforcing it. *Doe* v. *Maher,* 40 Conn. Sup. 394, 450, 515 A.2d 134 (1986). The attorneys' fees incurred by the plaintiffs, unlike the filing fees in *Boddie,* were not imposed upon the litigants by the state.[15]

Having concluded that the state did not impede the plaintiffs in their pursuit of constitutionally adequate "access" to the courts, the question that remains to be resolved is whether the state is obligated, pursuant to article first, § 10, to pay the attorneys' fees of indigent persons to ensure they have "access to a remedy for a violation of the state constitution." The plaintiffs argue that the state must pay their attorneys' fees because the state intentionally passed a regulation that infringed upon their constitutional entitlement to medically necessary abortions at state expense and therefore forced them to go to court to vindicate their rights. Without an award of counsel fees, the plaintiffs argue, indigents would be unable to pursue their right to judicial redress for injuries as provided by our state constitution. The plaintiffs cite no case which has so held.

When addressing whether a statute unconstitutionally restricts a plaintiff's right to a remedy pursuant to article first, § 10, we have long adhered to the principle that "[a]lthough this constitutional provision safeguards a person's 'right to redress' in the courts, it does not protect this right unless 'one suffers a recognized injury.' *Gentile* v. *Altermatt,* 169 Conn. 267, 284, 363

---

[15] At the time this action was commenced Practice Book § 50 "provided for a waiver of court costs and necessary expenses in commencing an action by an indigent '[i]n any case in which the plaintiff, without such a waiver will be deprived of a right by which he is entitled to bring an action . . . .' The named plaintiff never sought such a waiver when this suit was brought." *Doe* v. *Heintz,* 204 Conn. 17, 22, 526 A.2d 1311 (1987).

A.2d 1 (1975), appeal dismissed, 423 U.S. 1041, 96 S. Ct. 763, 46 L. Ed. 2d 631 (1976). Thus, a necessary prerequisite to the constitutional 'open court' requirement is that a person must suffer a cognizable 'injury.' Such an injury has been defined as ' "a legal injury, that is, one violative of established law of which a court can properly take cognizance." ' Id., 285, quoting *Taylor* v. *Keefe*, 134 Conn. 156, 163, 56 A.2d 768 (1947)." *Morris* v. *Hartford Courant Co.*, 200 Conn. 676, 684–85, 513 A.2d 66 (1986). "[A]n injury is not compensable absent recognition of that injury either by our courts or by specific statutory provision." *Gentile* v. *Altermatt*, supra, 285. "Thus the right of redress for injury is constitutional in its nature but the nature of a specific injury is a right derived from the common law or statute." Id.

The plaintiffs contend that they have suffered a "cognizable injury," the " 'necessary prerequisite' for the right to redress," on the basis of the trial court's holding in *Doe* v. *Maher* that the challenged regulation was invalid. The trial court did not hold nor do the plaintiffs contend, however, that all litigants who prevail in constitutional claims against the state, regardless of their economic status, are entitled to an award of counsel fees pursuant to article first, § 10. Rather, it is the plaintiffs' indigency which becomes the keystone of their argument. Their analysis thus confuses the claim on which they have already prevailed with their claim for counsel fees. Their current claim is that, as prevailing *indigents,* they are entitled to attorneys' fees, not that the constitutional violation from which they suffered a cognizable injury has not been redressed.

After a trial on the merits, the trial court declared the regulation invalid. Consequently, it enjoined the commissioner from enforcing the regulation and ordered the commissioner to pay for medically necessary abortions to the same extent as the defendants pay for all

other costs under the Medicaid program. On the basis of this record, it is clear that the plaintiffs received a "remedy by due course of law" for the *constitutional violation.* Nevertheless, the plaintiffs argue that the fact that they "obtained relief is not dispositive." They urge this court to uphold the award of attorneys' fees to the plaintiffs as an "ancillary remedy" to encourage counsel to represent indigents in future litigation. Without the possibility of an award of attorneys' fees, the plaintiffs contend that they are concerned that other indigents, unable to afford counsel, would lack access to a judicial remedy to enforce their constitutional rights. Thus, they advocate a general rule awarding attorneys' fees to plaintiffs who have satisfied the trial court's "standards" so that the right to access to our courts does not depend upon the "charitable impulse of the private bar or public interest groups" who provide legal services without cost.

Although the plaintiffs do not explain why the indigents could not receive a remedy, their argument implicitly assumes that the indigents' inability to afford counsel would also prevent them from obtaining either the assistance of lawyers who provide pro bono services[16] or, if warranted, court-appointed counsel. To the extent that the plaintiffs make their argument on behalf of others not in a direct adversarial posture before the court, that claim is not properly before us on appeal. "A litigant may only assert [her] own constitutional rights and immunities. *McGowan* v. *Maryland,* 366 U.S. 420, 429, 81 S. Ct. 1101, 6 L. Ed. 2d 393 [1961]; *United States* v. *Raines,* 362 U.S. 17, 22, 80 S. Ct. 519, 4 L.

---

[16] Rule 6.1 of the Rules of Professional Conduct provides: "A lawyer should render public interest legal service. A lawyer may discharge this responsibility by providing professional services at no fee or a reduced fee to persons of limited means or to public service or charitable groups or organizations, by service in activities for improving the law, the legal system or the legal profession, and by financial support for organizations that provide legal services to persons of limited means."

Ed. 2d 524 [1960]." *Silverman* v. *St. Joseph's Hospital,* 168 Conn. 160, 171–72, 363 A.2d 22 (1975); *Southern Connecticut Gas Co.* v. *Housing Authority,* 191 Conn. 514, 522, 468 A.2d 574 (1983).

Further, article first, § 10 "does not guarantee that all injured persons will receive full compensation for their injuries." *Estate of Cargill* v. *Rochester,* 119 N.H. 661, 665, 406 A.2d 704 (1979), appeal dismissed, 445 U.S. 921, 100 S. Ct. 1304, 63 L. Ed. 2d 754 (1980). For example, we have unquestionably recognized the legislature's authority to limit an injured party's cause of action; *Gentile* v. *Altermatt,* supra, 283; to limit the scope of a judicial hearing; *Southern Connecticut Gas Co.* v. *Housing Authority,* supra, 523 (application for rent receivership); and to enact statutes of limitations. *Stein* v. *Katz,* 213 Conn. 282, 289, 567 A.2d 1183 (1989); *Ecker* v. *West Hartford,* 205 Conn. 219, 234, 530 A.2d 1056 (1987); *Daily* v. *New Britain Machine Co.,* 200 Conn. 562, 582–86, 512 A.2d 893 (1986); see also *Morris* v. *Hartford Courant Co.,* supra, 684–85 (failure to state a claim upon which relief can be granted). Similarly, other states have recognized the legislature's authority to place statutory limits on the amount that a plaintiff can recover; *Estate of Cargill* v. *Rochester,* supra; and to impose governmental immunity; *Brown* v. *Wichita State University,* 219 Kan. 2, 10, 547 P.2d 1015, appeal dismissed, 429 U.S. 806, 97 S. Ct. 41, 50 L. Ed. 2d 67 (1976); without violating the "right to redress." See *Carroll* v. *County of York,* 496 Pa. 363, 366, 437 A.2d 394 (1981) (legislature could confer tort immunity upon political subdivisions without denying plaintiffs a "remedy by due course of law"). In addition, other states have recognized that the doctrine of sovereign immunity does not violate similar constitutional provisions. E.g., *Griggs* v. *State,* 702 P.2d 1017, 1019 (Okla. 1985); *Neal* v. *Donahue,* 611 P.2d 1125, 1129 (Okla. 1980); see *Ryszkiewicz* v. *New Britain,* 193

Conn 589, 598, 479 A.2d 793 (1984) ("[g]iven that governmental immunity was a well established judicial principle at the time of the Connecticut constitution's adoption in 1818 and in 1965, the provision granting access to courts for redress of grievances found in article first, § 10 cannot be construed as granting an unqualified right to recover unlimited damages from government entities").

Although article first, § 10 prohibits the state from placing obstacles in the path of the plaintiffs' quest to gain access to our courts, the state has no affirmative obligation to remove obstacles that it did not create. *Florida Bar* v. *Brumbaugh,* 355 So. 2d 1186, 1192 (Fla. 1978). "The financial circumstances of these plaintiffs, which are the root cause of their inability" to pay for the services of counsel, have not been produced by any action of the state. *Savage* v. *Aronson,* 214 Conn. 256, 284, 571 A.2d 696 (1990). While it is unfortunate that the plaintiffs cannot afford to pay their attorneys, it is a problem caused by their indigency and not by anything that the state has done to prevent their access to the courts.

The constitutional right to a remedy for all cognizable injuries does not delegate to the courts the legislative authority to create new rights under the law. *Cason* v. *Baskin,* 155 Fla. 198, 213–14, 20 So. 2d 243 (1944). The text of article first, § 10 is explicit: "[E]very person, for an injury done to him in his person . . . shall have a remedy *by due course of law.*" (Emphasis added.) Thus, the plaintiffs' right to a remedy must be recognized by an established legal principle, either in the common law or by statute, to be enforceable. This constitutional provision was "never intended to independently create new causes of action." *Harrell* v. *State,* 361 So. 2d 715, 718 (Fla. App. 1978) (no constitutional violation of access to courts provision of the state constitution when the welfare department refused to sup-

ply the indigents, seeking judicial review of the agency's decision, with a free transcript); *Alfree* v. *Alfree,* 410 A.2d 161, 163 (Del. 1979), appeal dismissed, 446 U.S. 931, 100 S. Ct. 2145, 64 L. Ed. 2d 783 (1980) (right to judicial redress of injuries does not allow court to create a right of action to abrogate the doctrine of interspousal immunity); *Brown* v. *Wichita State University,* supra, 10 (statute that imposed governmental immunity did not violate constitutional provision guaranteeing remedies for injuries). Rather, the provision was intended "to protect citizens in enforcing rights recognized by law." *Horner* v. *David Distributing Co.,* 599 S.W.2d 100, 102 (Mo. App. 1980). These courts uniformly recognize that the "redress provision" was intended to ensure that all citizens have the opportunity to present a cognizable claim before an unbiased judiciary and, if the claim is meritorious, obtain judicial relief in an equitable and fair manner. A right must be recognized in law, however, before a court has the proper authority to provide a remedy.

We are bound by the command of the text of the constitution. We do not have the authority to require the expenditure of public funds to the prevailing parties in cases where we, based upon our own predilections, might favor an award of attorneys' fees. "This court has never viewed constitutional language as newly descended from the firmament like fresh fallen snow upon which jurists may trace out their individual notions of public policy uninhibited by the history which attended the adoption of the particular phraseology at issue and the intentions of its authors. The faith which democratic societies repose in the written document as a shield against the arbitrary exercise of governmental power would be illusory if those vested with the responsibility for construing and applying disputed provisions were free to stray from the purposes of the originators." *Cologne* v. *Westfarms Associates,* 192 Conn. 48, 62, 469 A.2d 1201 (1984).

We conclude that article first, § 10 does not independently create a "right" to attorneys' fees. If the plaintiffs could have shown that they were entitled to counsel fees under either the common law or a statutory provision, then article first, § 10 guaranteed them "a constitutionally adequate system of justice capable of securing" their right to attorneys' fees and costs. *Pellegrino* v. *O'Neill,* 193 Conn. 670, 675–76, 480 A.2d 476, cert. denied, 469 U.S. 875, 105 S. Ct. 236, 83 L. Ed. 2d 176 (1984). They did not make such a showing, however, and therefore, if the plaintiffs are to prevail, we must determine whether there is an alternative basis upon which to affirm the trial court's award of attorneys' fees.

## IV

It is well entrenched in our jurisprudence that Connecticut adheres to the American rule. *Marsh, Day & Calhoun* v. *Solomon,* 204 Conn. 639, 653, 529 A.2d 702 (1987). Under the American rule, a party cannot recover attorneys' fees in the absence of statutory authority or a contractual provision. Id.; *Doe* v. *Heintz,* supra, 22–23; *Brookfield* v. *Candlewood Shores Estates, Inc.,* 201 Conn. 1, 14–15, 513 A.2d 1218 (1986); *Gino's Pizza of East Hartford, Inc.* v. *Kaplan,* 193 Conn. 135, 140, 475 A.2d 305 (1984).

The plaintiffs do not claim that there is any statute or contract provision which would entitle them to attorneys' fees in this case. Instead, the plaintiffs renew their arguments, first raised in *Doe* v. *Heintz,* supra, 21–29, that this court should exercise its equitable powers to affirm the award of attorneys' fees to the plaintiffs. Specifically, they urge this court to adopt either the "private attorney general" doctrine or the "substantial benefit" doctrine as a court-authored exception to the American rule. Although we have previously rejected both of these doctrines as excep-

tions to the American rule; id., 25–26; the plaintiffs urge us to reconsider them in light of the concurring opinion in *Doe* v. *Heintz*. Id., 38 (*Peters, C. J.,* concurring).

## A

The private attorney general doctrine " 'seeks to encourage suits effectuating a strong [public] policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.' [*D'Amico* v. *Board of Medical Examiners,* 11 Cal. 3d 1, 27, 112 Cal. Rptr. 786, 520 P.2d 10 (1974)]." *Serrano* v. *Priest,* 20 Cal. 3d 25, 43, 141 Cal. Rptr. 315, 569 P.2d 1303 (1977).

In *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U.S. 240, 271, 95 S. Ct. 1612, 44 L. Ed. 2d 141 (1975), the United States Supreme Court declined to adopt the private attorney general doctrine as an exception to the American rule. While recognizing that commentators have criticized the American rule in recent years, the court found it clear that Congress had not chosen to pass a statute abrogating the rule. Id., 260. Instead, the court found that Congress had fabricated a statutory structure in which it had specifically delineated when a prevailing party is entitled to attorneys' fees. Having done so, "it is not for [the court] to invade the legislature's province by redistributing litigation costs in the manner suggested" by the plaintiffs. Id., 271. The court concluded that any exception to the American rule should properly be made by Congress and not the court. Id., 262.

Likewise our legislature has not chosen to repudiate the American rule, but rather has made specific provisions for attorneys' fees in selected cases. For example, General Statutes § 52-251b allows the prevailing party in any civil action seeking damages for injuries

arising out of a violation of General Statutes § 46a-58 (discriminatory practices) to also recover costs, including reasonable attorneys' fees. See also General Statutes § 52-251a (allowing attorneys' fees in a small claims matter transferred to regular docket); § 52-249 (allowing attorneys' fees in an action for foreclosure). "Indeed, the legislature has specifically authorized the recovery of reasonable fees and expenses not exceeding $7500 against the state in a successful appeal of an administrative agency decision in a contested case for all but the most affluent of aggrieved persons. General Statutes § 4-184a. In view of this legislative policy of selecting the special situations where attorneys' fees may be awarded, we [conclude] . . . that it is inappropriate for the judiciary to establish under the private attorney general doctrine a broad rule permitting such fees whenever a private litigant has at substantial cost to himself succeeded in enforcing a significant social policy that may benefit others." *Doe* v. *Heintz,* supra, 24–25.

B

Under the substantial benefit doctrine, "when a class action or corporate derivative action results in the conferral of substantial benefits, whether of a pecuniary or nonpecuniary nature, upon the defendant in such an action, that defendant may, in the exercise of the court's equitable discretion, be required to yield some of those benefits in the form of an award of attorney's fees." *Serrano* v. *Priest,* supra, 34. Under this theory, "those receiving the benefit should contribute to the costs of its production." Id., 38. The rationale for such fee shifting is that "[t]o allow the others to obtain full benefit from the plaintiff's efforts without contributing equally to the litigation expenses would be to enrich the others unjustly at the plaintiff's expense." *Mills*

v. *Electric Auto-Lite Co.,* 396 U.S. 375, 392, 90 S. Ct. 616, 24 L. Ed. 2d 593 (1970); *Hall* v. *Cole,* 412 U.S. 1, 6, 93 S. Ct. 1943, 36 L. Ed. 2d 702 (1973).

The plaintiffs argue that they have conferred a "substantial benefit on all poor women in Connecticut, [i.e.] the right to state aid for medically necessary abortions." Leaving aside the question of whether the plaintiffs bestowed a benefit upon all poor women or only those poor women who seek a state financed abortion, we conclude that the plaintiffs have not conferred a substantial benefit upon all those on whom they seek to impose the financial burden of their counsel fees. To request the state, and hence the public, to pay for the plaintiffs' litigation expense imposes a financial burden on the state treasury, "a fund in which all citizens of this state, not just the plaintiff class of indigent women who may seek abortions, have a common interest." *Doe* v. *Heintz,* supra, 26.

To avoid this conclusion, however, the plaintiffs argue that they have conferred a benefit upon all citizens of this state by challenging unconstitutional actions by the state. To adopt such an abstract definition, however, would expand the substantial benefit doctrine beyond its underpinnings. We conclude that this is an inappropriate case for the application of the substantial benefit doctrine.

## C

The plaintiffs next urge this court simply to exercise its equitable powers to award them attorneys' fees. Citing the equitable maxims that "every wrong has its remedy"; *Chappell* v. *Jardine,* 51 Conn. 64, 69 (1884); and " 'in an equitable action the court endeavors to do complete justice. . . .'; *Howarth* v. *Northcott,* 152 Conn. 460, 465, 208 A.2d 540 (1965) [overruled on other grounds, *Hao Thi Popp* v. *Lucas,* 182 Conn. 545, 551, 438 A.2d 755 (1980)]"; *McGaffin* v. *Roberts,* 193 Conn.

393, 404, 479 A.2d 176 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1747, 84 L. Ed. 2d 813 (1985); the plaintiffs, in effect, advocate that we judicially undermine the well established American rule. The trial court rejected this argument, concluding that the rule requiring each party to bear his or her own litigation expenses has never been recognized as inequitable.

To support their argument, the plaintiffs assert that General Statutes § 52-251b, enacted three years after commencement of this action, evinces a broad legislative policy to allow fee-shifting under the facts of this case. To the contrary, we conclude that § 52-251b manifests an intent by the legislature to delineate specific exceptions to the American rule. Section § 52-251b (a) allows the prevailing party in "any civil action to recover damages for injury to the person or to real or personal property arising out of a violation of section 46a-58" to recover his costs, including reasonable attorney's fees. General Statutes § 46a-58 (a) makes it a discriminatory practice for any person to subject another to "the deprivation of any rights, privileges or immunities, secured or protected by the constitution or laws of this state or of the United States, on account of religion, national origin, alienage, color, race, sex, blindness or physical disability."

By its terms, § 52-251b applies only to civil actions to recover damages. Therefore, even if it applied retroactively, it would not apply to the current case because "no damages were awarded by the court or even sought in the complaint [in *Doe* v. *Maher*] as finally amended." *Doe* v. *Heintz,* supra, 28; General Statutes § 52-251b (a). Second, the statute explicitly rejects the expansive view advanced by the plaintiffs. Section 52-251b (b) distinctly provides that subsection (a), cited above, does not create a new cause of action against the state. "Statutory analogies may furnish guidance in filling a void in the law, but cannot

be utilized to extend a statute tailored for a precisely defined situation to others not included within its terms." *Doe* v. *Heintz,* supra, 27. We agree with the trial court that the plaintiffs are not entitled to attorneys' fees as a matter of equity.

The plaintiffs' final argument is that by requiring proof that the six factors set forth in the trial court's memorandum of decision are satisfied, see part III, supra, this court could and should use its equitable powers to formulate a narrowly circumscribed rule to authorize fee awards. We are unpersuaded. The legislature is in a far better position than the courts to balance the myriad of factors necessary to formulate policy on matters that so intimately concern the state budget. We must respect the "legislative prerogative of choosing the special circumstances under which such awards may be made." *Doe* v. *Heintz,* supra, 29.

We recognize that our decision may lead to harsh results where plaintiffs might be unable to vindicate their rights because they lack the necessary funds to hire an attorney and have no contractual or statutory right to attorneys' fees. Recognizing this problem, attorneys and organizations throughout the state provide pro bono services to needy clients. To the extent this solution is inadequate, it is the prerogative of the legislature, not the courts, to determine the circumstances under which an award of attorneys' fees to the prevailing party will be authorized.

The judgment is reversed and the case is remanded with direction to render judgment for the defendants.

In this opinion the other justices concurred.